IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DIONNE A. MONTAGUE, | § | |
| | § | |
| *Plaintiff*, | § | |
| v. | § | C.A. NO. 4:20-cv-4329 |
| | § | |
| LOUIS DEJOY, POSTMASTER | § | JURY TRIAL DEMANDED |
| GENERAL, UNITED STATES  POSTAL | § | |
| SERVICE (SOUTHERN AREA, | § | |
| | § | |
| *Defendant*. | § | |

**PLAINTIFF DIONNE MONTAGUE'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

_____/S/ *Ashok Bail*_____
ASHOK BAIL
ATTORNEY-IN-CHARGE
STATE BAR # 24043541

3120 Southwest Freeway, Suite 450
Houston, TX 77098
(832) 216-6693
(832) 263-0616 (Fax)
ashok@baillawfirm.com

**TABLE OF CONTENTS**

I.      NATURE AND STAGE OF THE PROCEEDING…………………………………………...1

II.     STATEMENT OF THE ISSUE AND STANDARDS OF REVIEW…………………….…...1

III.    INTRODUCTION AND SUMMARY OF ARGUMENT……………………………….....1

IV.     FACTUAL BACKGROUND………………………………………………………….....2

V.      DISPUTED MATERIAL FACTS……………………………………………………….9

VI.     SUMMARY JUDGMENT STANDARD……………………………………………….12

VII.    ARGUMENT AND CITATIONS OF AUTHORITIES………………………………....12

        A.  USPS Has Consented to and Acknowledged That This Court Has Jurisdiction
            Over Plaintiff's Disability Claims Under The Rehabilitation Act …………………………12

        B.  USPS Failed to Reasonably Accommodate Plaintiff………………………………………13

        C.  The Essential Functions of the CPS Position is to Communicate not to
            Drive, Travel or Have In-Person Meetings…………………………………………………14

        D.  The Accommodation Plaintiff Requested Did Not Create an Undue Hardship for USPS….22

        E.  Plaintiff Was Constructively Discharged When She Retired Because USPS
            Refused to Reasonably Accommodate Plaintiff……………………………………………23

VIII.   CONCLUSION……………………………………………………………………………24

## TABLE OF AUTHORITIES

*Acevedo v. City of Philadelphia*
680 F. Supp. 2d 716 (E.D. Pa. 2010) ……………………………………………………………………18

*Anderson v. Liberty Lobby*
477 U.S. 242 (1986)………………………………………………………………………………………12

*Chandler v. City of Dall.*
2 F.3d 1385 (5th Cir.1993)……………………………………………………………………………… 14

*EEOC v. LHC Group, Inc.*
773 F.3d 688 (5th Cir. 2014)………………………………………………………………………..14,17,22

*Evans v. City of Bishop,*
238 F.3d 586 (5th Cir.2000)……………………………………………………………………........12

*Green v. Adm'rs of the Tulane Educ. Fund*
284 F.3d 642 (5th Cir. 2002)…………………………………………………………………………… 12

*Hurley-Bardige v. Brown*
900 F. Supp. 567 (D. Mass. 1995)…………………………………………………………………….24

*Kapche v. City of San Antonio*
 304 F.3d 493 (5th Cir.2002) ……………………………………………………………………………14

*Lavern B. v. Department of Housing and Urban Development*
EEOC Appeal No. 0720130029 (February 12, 2015)…………………………………………………20

*Little v. Liquid Air Corp.*
37 F.3d 1069 (5th Cir. 1994)………………………………………………………………………........12

*Neely v. Pseg Texas, Ltd. Partnership*
735 F.3d 242 (5th Cir. 2013)…………………………………………………………………………… 13

*Pagonakis v. Express LLC*
315 F. App'x. 425 (3d Cir. 2009)………………………………………………………………………24

*Prewitt v. U.S. Postal Service*
662 F.2d 292 (5th Cir.1981) ……………………………………………………………………………19

*Reeves v. Sanderson Plumbing Prods., Inc.*
530 U.S. 133 (2000)………………………………………………………………………………………12

*Slayton v. Sneaker Villa, Inc.*
CIVIL ACTION No. 15-0074  (E.D. Pa. Mar. 20, 2017)………………………………………………18

*Smith v. Henderson*
376 F.3d 529 (6th Cir. 2004) ……………………………………………………………………………23

*Skerski v. Time Warner Cable Co.*
257 F.3d 273 (3d Cir. 2001) ……………………………………………………………….18

*Schwarz v. Northwest Community Coll.*
881 F. Supp. 1323 (N.D. Iowa 1995) ……………………………………………………24

*Talley v. Family Dollar Stores of Ohio, Inc.*
542 F.3d 1099 (6th Cir. 2008) …………………………………………………………...23

*Turco v. Hoechst Celanese Corp.*
101 F.3d 1090 (5th Cir.1996)…………………………………………………………….14

*Tracey L. Johnson, et al. v. City of Shelby, Mississippi*
574 U.S. 10 (2014)……………………………………………………………………….13

*Waggoner v. City of Garland*
987 F.2d 1160 (5th Cir.1993)……………………………………………………………12

**Statutes**

Rehabilitation Act ………………………………………………………………….4,8,13

Americans With Disabilities Act (ADA) ……………………………………...13,14,18,19,22

Interpretive Guidance on Title I of the Americans With Disabilities Act,
29 C.F.R. pt. 1630, app. § 1630.2(n) …………………………………………………17

Section 42 U.S.C. § 12111(8) of the ADA ……………………………………………14

29 C.F.R. § 1630.2(n)(2) ……………………………………………………………......14

29 C.F.R. § 1630.2(n)(3) ………………………………………………………………15

42 U.S.C. § 12111(8) …………………………………………………………….14,17

42 U.S.C. §  12112(b)(5)(A) …………………………………………………………22

42 U.S.C. §  12111(10)(A) …………………………………………………………22

42 U.S.C. §  12111(10)(B) …………………………………………………………22

**Other Authorities**

136 Cong. Rec. 11,451 (1990) ………………………………………………………18,19

5 Wright & Miller………………………………………………………………………13

F.R.C.P.56………………………………………………………………………......1,12

Fed. Rules Civ. Proc. 8(a)(2) and (3), (d)(1), (e)………………………………………13

Fed. Rules Civ. Proc. 15(a)(2)…………………………………………………………13

## I.     NATURE AND STAGE OF THE PROCEEDING

This is a disability discrimination in employment case brought against Defendant Agency, the United States Postal Service ("Agency" or "USPS"). USPS moved for summary judgment against all claims and causes of action asserted by Plaintiff Dionne Montague. Plaintiff files this Response in opposition to Defendant's Motion for Summary Judgment. For the reasons given therein, and based also on the supporting materials submitted in the accompanying exhibits to this Response, Plaintiff respectfully requests that summary judgment be denied on the following specific issue:

## II.    STATEMENT OF THE ISSUES AND STANDARDS OF REVIEW

In presenting this Response, Plaintiff respectfully asks the Court to determine the following:

**<u>Issue:</u>**

As only the third element of a *prima facie* case for Plaintiff's claim that USPS failed to accommodate Plaintiff is in dispute, Plaintiff can be successful on her failure to accommodate claim if she can demonstrate that USPS denied or failed to make reasonable accommodations.

## III.   INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiff respectfully requests that, pursuant to Federal Rules of Civil Procedure 56, the Court deny USPS' motion for summary judgment in its entirety.

Plaintiff was diagnosed with Juvenile Diabetes Mellitus (Type 1 Diabetes) in 1976 at the age of 10. Prior to her constructive discharge, Plaintiff was employed by the Agency for over thirty years. During that time period, Plaintiff was an exemplary employee, who consistently received excellent performance evaluations, numerous awards and recognitions for her contributions and work performance. Plaintiff began suffering from complications of Diabetic Peripheral Neuropathy in 2013 and notified her Manager, Polly Gibbs, of her condition. Ms. Gibbs provided Plaintiff with the reasonable accommodation of telecommuting from home on an *as-needed* basis for a period of approximately 5 to 6 months. This accommodation ceased when the Agency experienced a cyber intrusion on or about November 2014. The cyber intrusion prompted the Agency to temporarily suspend all telecommuting work across the Agency. *Id*. This suspension was lifted several months later

1

in April 2015. On July 13, 2015, Plaintiff asked Ms. Gibbs, to resume the Reasonable Accommodation that had previously been afforded her. This reasonable accommodation allowed Plaintiff to telecommute from home on an as-needed basis, during her neuropathy flare-ups. This accommodation was effective and efficient with no hardship to the Agency. Nevertheless, the Agency denied Plaintiff's requested reasonable accommodation, alleging that "driving", "traveling" and making "in-person appearances" were essential functions of a Communications Programs Specialist (CPS) position. However, Plaintiff maintains that driving, traveling and in-person contact were means of performing essential functions and not, in themselves, essential functions.  Indeed, along with a plethora of documented evidence, the testimonial evidence of Plaintiff and her coworkers, Mr. Steven Seewoester, Mr. McKinney Boyd, and Mr. Yul Melenson prove that Plaintiff's reasonable accommodation request would not have created an undue financial burden or administrative burden on the Agency. In fact, exactly the opposite is true, as the Federal Government has acknowledged that Telework and Remote Work have been proven to be so efficient in reducing costs that the United States Office of Personnel Management (OPM) encourages Agencies to expand Telework and Remote work permanently. Indeed, the reasons given by the Agency to deny Plaintiff's reasonable accommodation requests are nothing more than fabrications designed to deflect the Honorable Court's attention from the truth and are unworthy of credence.

## IV.    FACTUAL BACKGROUND

At the time of events giving rise to the complaint, Plaintiff was employed as a Communication Programs Specialist (CPS), domiciled in the Southern Area, Houston District. (EEO Affidavit of Dionne Montague attached as Exhibit 2 to this response, at p. 00062, Q2-3). Plaintiff was the CPS for the Houston and Gulf Atlantic Districts. *Id* at p. 00065, Q15. However, Plaintiff was an employee of the US Postal Service Headquarters Division. *Id* at p. 00062, Q2.

The relevant Position Description identifies that a CPS is to serve as a spokesperson for the US Postal Service; gathering, writing, editing and disseminating a wide variety of information in response

to inquiries from representatives of the news media. (Communication Programs Specialist Job Description attached as Exhibit 8 to this response, at p. 1). The Position Description further states that a CPS creates and executes a full range of communications programs designed to promote products and services, as-well-as writes, edits, and designs a monthly employee publication. *Id* at p.1. The Position Description also provides that a CPS offers communications guidance to postal officials in assigned districts. *Id.* **Notably, the Position Description makes no mention of "driving", "traveling" or "in-person contact."** (Lisa Williams the Manager of Disability Programs Deposition is attached as Exhibit 20 to this response, at pp. 24-27)

Plaintiff was diagnosed with Juvenile Diabetes Mellitus (Type 1 Diabetes) in 1976 at the age of 10. (Exhibit 2, p. 00063, Q5). Plaintiff began working for the United States Postal Service, Agency, in 1987. (Form 50 attached as Exhibit 25 to this response, at p. 1, #7). Over her 30-year career, with the Agency, Plaintiff received numerous awards and recognition for her contributions and work performance. (Montague's End Of Year performance rating attached as Exhibit 6 to this response, at pp. 1-5) and (Montague's Awards and Recognition attached as Exhibit 10 to this response, at pp. 1-20). Montague, continuously advanced to management positions of increasing responsibility; then finally to the position of a Communication Programs Specialist EAS-23, which she held at the time of her unlawful constructive discharge. (Exhibit 25 at p. 1, #52, #60, #61).

Montague began suffering from complications of Diabetic Peripheral Neuropathy in 2013 and notified her Manager, Polly Gibbs, of her condition. (Exhibit 2, p. 00063, Q7) and (EEO Affidavit of Polly Gibbs attached as Exhibit 18 to this response, p. 00127, Q3). Plaintiff's physicians prescribed medication and other treatments to manage her neuropathy with the goal of improving her symptoms and functionality. (Letter from Dr. Benny Wang attached as Exhibit 29 to this response, p. 00097, Q3). Adjustments to Plaintiff's medication was ongoing and made throughout the relevant time with the goal of reducing the symptoms of the unwanted side effects and stabilizing Plaintiff's condition. (Letter from Dr. Ferrer attached as Exhibit 32 to this response, at p. 00105).

3

In 2014 the Agency provided Plaintiff with the reasonable accommodation of telecommuting from home on an *as-needed* basis. (Declaration of Polly Gibbs attached as Exhibit 30, to this response, at p. 2, #6-7), (Deposition of Polly Gibbs attached as Exhibit 17 to this response, at pp. 83, 86). And (Exhibit 2, at p. 00065, Q15, Q16). This reasonable accommodation was provided by Ms. Gibbs for 5-6 months and was provided without going through the Agency's Reasonable Accommodation Committee (RAC). (Montague Appeal Letter to Joseph Bruce attached as Exhibit 31 to this response, at p. 00093, par 6). The accommodation was provided prior to the Agency experiencing a cyber intrusion which occurred in November 2014. *Id.* The cyber intrusion prompted a temporary suspension of all telework across the Agency. *Id.* The suspension was lifted several months later in April 2015. (Exhibit 30, at p. 2, #12).

During the period telework was suspended, Plaintiff resumed working from her domiciled office and stopped taking her medication which caused the side-effects that temporarily prohibited her from driving. (Exhibit 31, at p. 00093, par 6). Plaintiff worked hard to tolerate her symptoms; however, Plaintiff could no longer bear it after having a flare-up and episode of debilitating pain while working at her domiciled office. *Id.* This led to her treating physician instructing her to resume taking her medication and suggested that Plaintiff work from home, a*s needed*, until her condition stabilized. (Exhibit 32, at p. 00105) and (RAC Form B: Medical Information attached as Exhibit 34 to this response, at p. 00107, #2, #4).

On July 13, 2015, Plaintiff who had a protected disability under the rehabilitation Act of 1973, requested from her Manager, Polly Gibbs, to resume the Reasonable Accommodation that had previously been afforded her. (Exhibit 2, at p. 00065, #21, #22, #23, #24). The reasonable accommodation previously provided allowed the Plaintiff to <u>telecommute from home on an as-needed basis, during her neuropathy flare-ups.</u> (Exhibit 31, at P00093, par 6). This accommodation was effective and efficient with no hardship to the agency. (Affidavit of Houston District Manager, Yul Melonson attached as Exhibit 5 to this response, at p. 1, #3, #4, #5).

4

Further, Plaintiff testified that she was very successful at accomplishing all the essential functions of her job while being afforded this accommodation. (Exhibit 17, p. 84, #18-25) and (Exhibit 2, at p. 00065, #15, #16). Plaintiff also continued to accomplish all the essential functions of her job for her non-domiciled district (Gulf Atlantic: South Georgie, North Florida and Texas Panhandle) remotely, as Plaintiff had always done without driving to face-to-face meetings. *Id.* As evidenced by the exceptional performance review and evaluation Plaintiff received, during the time period she was being accommodated in 2014, that such accommodation posed no undue hardship on the Agency. (Exhibit 6, pp. 1-5). The performance review and evaluation was written and submitted by Ms. Gibbs. *Id.* Plaintiff's Physician, after reviewing Plaintiff's Job Description, also stated that Plaintiff could perform the duties of her position with the accommodation of working from home <u>as needed</u>. (Letter from Dr. Benny Wang - Driving, attached as Exhibit 14 to this response, at p. 1).

Ms. Gibbs' response to Plaintiff's request, at that time, was "***Yes, we can resume the accommodation; however, let's go through the Reasonable Accommodation process so we can have it documented on paper this time.***" (Declaration of Dionne Montague attached as Exhibit 1, p. 1, #4) and then Ms. Gibbs proceeded to refer Plaintiff's request to the Agency's Reasonable Accommodation Committee (RAC). (Exhibit 30, at p. 2 at # 15) and (Exhibit 19, at p. 135. Q4).

On December 21, 2015, Plaintiff's reasonable accommodation request to the RAC was denied, as Ms. Gibbs wrote "***I have received a recommendation from the Reasonable Accommodation Committee (RAC) concerning your request for a reasonable accommodation. As noted below, the RAC has recommended to me that your request be denied,*** *at least at this time*"**.** (Polly Gibbs First Denial Letter attached as Exhibit 36 to this response, at p. 00091, par 1). The Agency stated there were two reasons for the initial denial. (Exhibit 36, p. 00091, par 4-5). First, Plaintiff's doctor had not responded to their request for additional information. *Id.* And second, it was not clear the exact nature of the accommodation Plaintiff was seeking. *Id.* The Agency further stated, in the initial denial letter, that Plaintiff's doctor suggested that Plaintiff work full-time from home. *Id.* However, **Plaintiff's**

**doctor on numerous occasions stipulated work from home <u>as-needed,</u> as the requested accommodation and stipulated Plaintiff could perform her job duties with this recommended accommodation.** (RAC Form B: Medical Information attached as Exhibit 34, at pp. 00107 - 00108). Plaintiff's physicians never said that Plaintiff needed to be allowed to work full-time from home as an accommodation; but, rather requested her accommodation be "as-needed", "intermittently", "periodically" or "until her condition stabilizes". (Letter from Dr. Benny Wang, Response to Medical Information Request attached as Exhibit 29 to this response, at p. 00097) and (Exhibit 32, at p. 00105).

On December 31, 2015, Plaintiff appealed the reasonable accommodation initial denial to Joseph Bruce, Manager, Human Resources (HQ) and provided additional clarification to address the issues listed in the initial denial letter. (Exhibit 31, at p. 00093).

On January 29 2016, Plaintiff was referred back to Ms. Gibbs and Lisa Williams, Manager, Disability Program by Joseph Bruce Manager Human Resources (HQ). (Joseph Bruce response letter attached as Exhibit 35 to this response, at p. 00095).

On March 24, 2016, the Manager of Disability Programs, Lisa Williams, reopened the case after receiving the documents clarifying Plaintiff's request and medical documentation from Plaintiff's treating neurologist. (Letter from Lisa Williams requesting Medical Documents attached as Exhibit 28 to this response, at p. 00096) and (Exhibit 29, at p. 00097).

On May 17, 2016, the Agency held a second interactive meeting between Plaintiff and the Reasonable Accommodation Committee (RAC). (Declaration of Dionne Montague attached as Exhibit 1 to this response, at p. 1, #4) During this meeting members of the RAC took turns asking the Plaintiff questions about her medical background, medications and limitations. *Id* at p.1 After a while, the RAC team members began to mock the Plaintiff and use derogatory statements, showing contempt towards the Plaintiff. *Id.* Acting, Dispute Resolution Specialist, Arlene Gordan's comments included (1) ***"We googled your house and know where you live. The distance from your house to your office is only 700 yards away, and that's if you take the road. Matter-of-fact if you were to remove the fence in***

**front of your house, or jump over it, you would be in front of the Post Office." (2) "My Aunt has Diabetes and she's able to work." (3) "If you can't drive, you could just walk."** (Exhibit 1, at p. 2, #7). This suggestion was made after another member of the RAC team suggested the Plaintiff could get a car service, take a taxi or get a ride to work with her husband each morning. (Exhibit 19 at P00136, Q22). To which, Plaintiff explained it would not be possible for her husband to take her to and from work for two reasons. (Exhibit 1, at p. 3, #8). (1) His duty station was approximately one hour from their home and his position hours were from 8am to 5pm which requires him to leave home at 7am. *Id.* This would necessitate Plaintiff's husband dropping her off prior to 7am and not returning to pick her up until approximately 6pm or later; resulting in Plaintiff having an unreasonable 11-hour workday. *Id.* (2) His position required him to travel for OSHA and safety inspections. These inspections occurred frequently, at various times and locations, with some overnight travel; therefore, his schedule would hinder him from being readily available. *Id.*

In addition, Plaintiff did not accept the suggestion of having a daily car service or taking a taxi as it would have been an exorbitant expense that the Plaintiff was unable to incur. (Exhibit 1, at p. 3, #9) Defendant did not offer to incur the expense of a daily car service or taxicab to transport the Plaintiff to and from work; therefore, not an offer of an accommodation, but rather a suggestion. These above examples of comments, made by Agency officials during the second interactive meeting, show the Agency's lack of capacity to operate with standards of ethics and an unwillingness to conduct the interactive and reasonable accommodation process in good faith. (Exhibit 1, at pp. 3-4, #10).

Indeed, Plaintiff has always maintained a drivers license (Montague's Drivers License(s) attached as Exhibit 13 to this response, at p.1). Plaintiff has never been asked or told by her doctor to surrender this license. (Exhibit 14, at p.1). Further, Plaintiff was not permitted to provide the supplemental documents regarding this matter, even though she repeatedly requested, duringn the course of the second interactive meeting, that she be allowed to do so.  (Exhibit 1, at pp. 3-4, #10).

On June 14, 2016, Plaintiff's second request for the Reasonable Accommodation of telecommuting in the mornings and reporting to her domiciled office by noon, was denied by the agency. (Exhibit 33, at pp. 00101-00104). The Agency, when asked, **"Was the complainant medical impairments a factor allegedly being denied a reasonable accommodation?,** answered *"Complainant was denied an accommodation for the limitations caused by her disability…"* (Exhibit 18, p. 00132, Q28). This statement, in and of itself, is an admission of discrimination based on disability. *Id.*

On June 22, 2016, Plaintiff filed an EEO discrimination claim against the Agency based on Disability (Diabetes Mellitus, Diabetic Peripheral Neuropathy, Demyelinating Neuropathy) discrimination. (Letter acknowledging EEO complaint attached as Exhibit 40 to this response, at p. 00030).

On or about July 2017 Plaintiff was constructively discharged and forced to file for disability retirement, because the Agency refused to provide her a reasonable accommodation. (Exhibit 1, p. 6).

On February 1, 2018, the Agency filed a motion for finding of fact and conclusion of law without a hearing; while the records were being developed.

On March 28, 2019, the Agency issued a final order adopting the AJ's summary judgment decision in favor of the Agency.

The parties agree that Montague is a person with a disability as contemplated under the Rehabilitation Act of 1973.  (Polly Gibbs 2nd Denial Letter attached as Exhibit 33 to this response, at p. 00101, par 2).

The parties also agree that Montague is a qualified individual who meets the educational and experience requirements for the CPS position. (EEO Affidavit of Lisa Williams attached as Exhibit 19 to this response, at p. 00135, Q12).

## V.    DISPUTED MATERIAL FACTS[1]

1.    Plaintiff maintains there was no travel requirement communicated to the Plaintiff by Ms. Gibbs or by anyone employed by the Agency. (Exhibit 1, at p. 5, #15). Also, Plaintiff maintains the functional purpose, job description, and job requirements listed in the Communication Programs Specialist (CPS) official position posting does not stipulate travel as a necessity or requirement. (Exhibit 8, at pp. 1-2). Further, Plaintiff maintains all CPS position requirements and duties are the same and not determined by assigned districts. (Exhibit 1, at p. 1, #3).

2.    Plaintiff maintains the essential function of a CPS' position is to communicate information to the media, USPS leadership and Employees. (Exhibit 1, at p. 4, #13). The job description and job requirements listed in the Communication Programs Specialist (CPS) official position posting does not stipulate travel or driving as an essential function or requirement of how the communication needs to be conducted. (Exhibit 8, pp. 1-2). Further, Plaintiff maintains travel was not an essential function to perform the duties of a CPS' position as Plaintiff performed all the essential functions of the CPS position remotely for one of her two assigned districts (Gulf Atlantic: South Georgie, North Florida and Texas Panhandle), without traveling 50% of the time to face-to-face meetings, on an ongoing basis for approximately eight years. (Exhibit 1, at p. 4, #11) and (Exhibit 3, p.1) and (Exhibit 4, p. 1).

3.    Plaintiff maintains that CPS' spend a minimal amount of time dedicated to activities outside of the office; nowhere close to Ms. Gibbs' estimated 50%. (Exhibit 16, at p. 1). Plaintiff also maintains that meetings were conducted primarily via telephone, conference calls, and other electronic means, not in person. (Exhibit 5, at p. 1) and (Exhibit 3, at p. 1) and (Exhibit 4, at p. 1).

4.    Plaintiff maintains that Ms. Gibbs did not assign the districts based on one larger district that required extensive travel and one smaller district that requires minimal travel, they were already assign when Ms. Gibbs acquired the position of Manager of Corporate Communications over Plaintiff and her coworkers identified in this Response. (Exhibit 1, at p. 1, #2). Plaintiff's assigned districts changed once in eight years, from Oklahoma to Gulf Atlantic, and that change was made at the request of Plaintiff. *Id.* Further, Plaintiff maintains, one CPS managed almost all of the districts in the Southern Area, at one point or the other, over his 19-year career as a CPS, from his domiciled location of Dallas; all were managed in the same way remotely and without extensive travel.  (Exhibit 3, p. 1).

5.    Plaintiff maintains her travel for face-to-face meetings in her domiciled district were minimal prior to her request for accommodation. (Affidavit of District Manger, Yul Melonson attached as Exhibit 5 to this response). Travel to Plaintiff's non-domiciled district for face-to-

---

[1] Please note that each of the listed disputed material facts in this Response corresponds in *seriatim* with the Agency's alleged "Undisputed Material Facts" on pages 5 and 6 of Defendant's MSJ.

face meetings occurred twice over a two-year period -FY 2014 and FY2015. (Exhibit 15, p. 00142).

6.      Plaintiff does not dispute the facts listed under Paragraph Number 6 of Defendant's MSJ.

7.      Plaintiff maintains it was not possible for her husband to take her to and from work for two reasons: (1) His duty station was approximately one hour from their home and his position hours were from 8am to 5pm, requiring him to leave home at 7am. (Exhibit 1, at p. 3, #8 and #9). This would necessitate Plaintiff's husband dropping her off prior to 7am and not returning to pick her up until approximately 6pm or later; resulting in Plaintiff having an unreasonable 11-hour workday. *Id.* (2) His position required him to travel frequently for OSHA and safety inspections. *Id.* These inspections occurred at various times and locations, with some overnight travel; therefore, his schedule would also hinder him from being readily available. *Id.* In addition, Plaintiff did not accept the suggestion of having a daily car service or taking a taxi as it would have been an exorbitant expense that the Plaintiff was unable to incur. *Id.* Defendant did not offer to incur the expense of a daily car service or taxicab to transport Plaintiff to and from work; therefore, not an offer of a reasonable accommodation, but rather a suggestion. *Id.* To Plaintiff's astonishment, Ms. Arlene Gordan (RAC committee member) also suggested that Plaintiff walk to work despite Plaintiff's mobility limitations. (Exhibit 1, at pp. 2-3, #7).

8.      Plaintiff's requested accommodation was to telecommute (work from home), *as needed, in the mornings and report to her domiciled office by noon*. (Exhibit 31, p. 00093, par 3).

9.      Plaintiff's medical evidence did not show, that because of her <u>diabetes</u> and the medication she took to treat it, Plaintiff had periods of incapacitation, numbness in her feet, and she was not able to walk, stand, or drive for periods of the day up to 5 days per week. (Exhibit 14, p.00105). But rather showed that the medication she took, on a periodic basis (or as needed) for her <u>Diabetic Neuropathy flare-ups,</u> may cause side effects, of which her treating physicians were working to adjust, minimize and stabilize. (Exhibit 29, at p.1, #3).

10.      Plaintiff maintains that the evidence shows that the Plaintiff's requested reasonable accommodation of working from home, telecommuting as needed, was not unreasonable, would not create an undue hardship and would allow her to fully fulfill the essential functions of her job. (Exhibit 5, at p.1, #3, #4, #5). Plaintiff previously, successfully, demonstrated this while telecommuting, as needed, for 5-6 months prior to the cyber intrusion; Plaintiff received a monetary award for her work and an excellent performance review during this time. *Id.* In addition, all CPS' are currently telecommuting full-time and have been doing so for the past 18 months; further evidencing it would not create an undue hardship. (Exhibit 17, pp. 99-100). Further, **Plaintiff asserts the Agency did not deem telecommuting a hardship when they accommodated Montague before the cyber intrusion and it isn't a hardship now, as all current CPS' are currently telecommuting.** (Exhibit 2, p. 00065, 16) and (Exhibit 30, p. 2, #7).

11. Plaintiff maintains that her initial accommodation request was to work from home <u>as needed</u> and never requested to work from home full-time. (Exhibit 34, pp. 00107-00108). Plaintiff maintains, that at the request of the Agency, she clarified her reasonable accommodation request to work from home in the mornings and report to her domiciled office by noon. (Exhibit 31, at P. 00093) This was clearly stated in her letter to Joseph Bruce and subsequently Lisa Williams and Polly Gibbs. *Id.*

12. Plaintiff maintains that the USPS' normal policy was to allow telecommuting for up to 3 days per week. (Management Instructions attached as Exhibit 21 to this response, at pp. 1-3). And adjustments to that normal policy were permitted, at management's discretion, such as, for the purpose of a reasonable accommodation, which was evident when Defendant provided the Plaintiff with "a more relaxed telecommuting schedule" prior to the cyber-attack. (Exhibit 30, p. 2. #7).

13. Plaintiff does not disagree with Defendant's statement on Paragraph 11 of their MSJ. (Def. MSJ, p. 6). However, it should be noted that Plaintiff's telework arrangement had no adverse affect on her work or performance, during the time Plaintiff was previously accommodated prior to the cyber-attack, as evidenced by the excellent performance review and evaluation Plaintiff received from the Ms. Gibbs for that time period. (Exhibit 6, p. 1-5).

14. Plaintiff maintains that the Defendant (USPS) has already determined working at an alternative worksite can be efficiently accomplished, as it had no adverse effect on Plaintiff's work or performance during the time Plaintiff was previously accommodated. (Exhibit 5, at p. 1, #3, #4, #5). This is also evident by the excellent performance review and evaluation Plaintiff received from the Ms. Gibbs, during the time Plaintiff was being accommodated. (Exhibit 6, pp. 1-5) Further, the effectiveness and efficiency of working from an alternative worksite is documented, by the Agency, in a 2010 Press Release titled "**Human Resource Innovation Savings Exceeds $150 Million Annually**" where it states the following: **Telecommuting -** *"Flexible work arrangements for headquarters and related employees allow employees to work remotely, reducing commuting costs. Approximately 2,500 employees now either telecommute or participate in an alternate work schedule program, saving an estimated 125,000 gallons of gas and 2.7 million pounds of greenhouse gas emissions annually.* (Press Release," $150 Million Saved" attached as Exhibit 22 to this response, at p. 4). In addition, all CPS' are currently telecommuting (working from an alternative worksite) and have done so for the past 18 months. (Exhibit 17, pp. 99-100). Further the Office of Personnel Management (OPM) on November 12, 2021 sent a memorandum for **Heads of Executive Departments and Agencies** updating the official 2021 Guide to Telework and Remote Work in the Federal Government. (OPM Memorandum to Executives attached as Exhibit 24 to the response, pp. 1-2). The Government Executive Newsletter states: "**OPM Encourages Agencies to Expand Telework, Remote Work Permanently**" because of the proven efficiency and effectiveness of telework. (OPM Expands Telework attached as Exhibit 23 to this response, at pp. 1-2).

## VI.   STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure summary judgment is appropriate when the pleadings and record evidence show that no genuine issues of material facts exist and that, as a matter of law, the movant is entitled to judgment. *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994). "Although summary judgment is not favored in claims of employment discrimination, it is nonetheless proper when 'there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.' " *Waggoner v. City of Garland*, 987 F.2d 1160, 1164 (5th Cir.1993) (quoting Fed.R.Civ.P. 56(c)). In making a summary judgment determination, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." *Evans v. City of Bishop*, 238 F.3d 586, 589 (5th Cir.2000).

The Supreme Court has emphasized the paramount role that juries play in discrimination cases stressing that in evaluating summary judgment evidence, courts must refrain from the making of "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, [which] "are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150 (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Because credibility determinations are the exclusive province of the jury, the law is clear that a court may not make credibility determinations or weigh the evidence when deciding whether to grant summary judgment. *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 653 (5th Cir. 2002).

## VII.   ARGUMENT AND AUTHORITIES

### A. USPS Has Consented to and Acknowledged That This Court Has Jurisdiction Over Plaintiff's Disability Claims Under The Rehabilitation Act

On or about April 26, 2021, USPS filed its Answer to Plaintiff's Original Complaint acknowledging the following, "The Defendant denies that jurisdiction exists under the Americans with Disabilities Act. **However, the Defendant asserts that jurisdiction exists under the Rehabilitation Act**." (Dkt. #8, p. 2). In addition to the Agency consenting to this Court's jurisdiction under the

Rehabilitation Act, the fact that Plaintiff pled her disability discrimination claims under the ADA, but did not also identify the Rehabilitation Act is not fatal to Plaintiff's disability discrimination claims before this Court. *See Tracey L. Johnson, et al. v. City of Shelby, Mississippi,* 574 U.S. 10 (2014), wherein the U.S. Supreme Court held the following:

"Petitioners stated simply, concisely, and directly events that, they alleged, entitled them to damages from the city. Having informed the city of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim. See Fed. Rules Civ. Proc. 8(a)(2) and (3), (d)(1), (e). **For clarification and to ward off further insistence on a punctiliously stated 'theory of the pleadings,' petitioners, on remand, should be accorded an opportunity to add to their complaint a citation to Sec. 1983.** See 5 Wright & Miller, *supra*, Sec. 1219, at 277-278 ("**The federal rules effectively abolish the restrictive theory of pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief.**" (footnotes omitted)); Fed. Rules Civ. Proc. 15(a)(2) ("The court should freely give leave {to amend a pleading} when justice so requires.")." *Tracey L. Johnson, et al. v. City of Shelby, Mississippi,* 574 U.S. 10, at pp. 2-3 (2014).

Plaintiff's Original Complaint, in the matter before this Court, stated simply, concisely, and directly events that she alleges entitle her to damages from the Agency. (Dkt. #8, p. 1).  However, pursuant to the U.S. Supreme Court's decision in *Tracey L. Johnson, et al. v. City of Shelby,* Plaintiff will be filing a Motion for Leave to file an Amended Complaint, for the Court's consideration, to add to her complaint a citation to the Rehabilitation Act.

### B.  USPS Failed to Reasonably Accommodate Plaintiff

5th Circuit precedence establishes that a Plaintiff "must prove the following statutory elements to prevail in a failure-to-accommodate claim: (1) the plaintiff is a `*qualified individual with a disability;'* (2) the disability and its consequential limitations were `known' by the covered employer; and (3) the employer failed to make `reasonable accommodations' for such known limitations." *Neely v. Pseg Texas, Ltd. Partnership*, 735 F.3d 242, 247 (5th Cir. 2013).

It should be noted that the Agency does not contest the first two elements of Plaintiff's failure to accommodate claim. (Def. MSJ, p. 12)

However, in the present matter, the Agency failed to make reasonable accommodation for known limitations of Plaintiff.

13

**C. The Essential Functions of the CPS Position is to Communicate *not* to Drive, Travel or to Have In-Person Meetings**

The 5th Circuit has ruled that to avoid summary judgment, a Plaintiff must show:

"that either **(1) Sones could "perform the essential functions of the job in spite of [her] disability," or, if she could not, (2) that "a reasonable accommodation of [her] disability would have enabled [her] to perform the essential functions of the job.** *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir.1996) (per curiam) (citing the ADA, 42 U.S.C. § 12111(8), which defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position ."). **A function is "essential" if it bears "more than a marginal relationship" to the employee's job.** *Chandler v. City of Dall.*, 2 F.3d 1385, 1393 (5th Cir.1993), holding modified on other grounds as discussed in *Kapche v. City of San Antonio*, 304 F.3d 493 (5th Cir.2002) (per curiam). **The ADA defines "reasonable accommodations" to include job restructuring, part-time or modified work schedules, reassignment to a vacant position**, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 697 (5th Cir. 2014).

Section 42 U.S.C. § 12111(8) of the ADA states that, in assessing whether a given job function is essential, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

Additionally, the Equal Employment Opportunity Commission's ("EEOC") "Interpretive Guidance" defining "essential functions" states that a function may be deemed "essential" because: (i) the reason the position exists is to perform that function; (ii) the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) the function may be highly specialized so that the incumbent in the position is hired for her expertise or ability to perform the particular function. 29 C.F.R. § 1630.2(n)(2).

The EEOC regulations further set forth a non-exhaustive list of evidentiary examples that may assist courts with identifying the "essential functions" of a job: (i) the employer's judgment as to which functions are essential (which reiterates the dictates of § 12111(8)); (ii) written job descriptions prepared before advertising or interviewing applicants for the job; (iii) the amount of time spent on the

14

job performing the function; (iv) the consequences of not requiring the incumbent to perform the function; (v) the terms of a collective bargaining agreement; (vi) the work experience of past incumbents in the job; and/or (vii) the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3).

Plaintiff asserts the RAC failed to operate in good faith when they did not follow **The Reasonable Accommodation, An Interactive Process guidelines handbook EL - 307** which States: "The essential functions of a job are those functions that define the job." (USPS Handbook EL-307 attached as Exhibit 38 to this response, at p. 00191). In other words, the job exists to perform those tasks. *Id.* The essential functions of a job are not the marginal or infrequently performed tasks that could be eliminated without altering the fundamental nature of the job." *Id.* "The term "Essential Functions" is defined as the fundamental job duties of the position." (Exhibit 38, at p. 00196).

As outlined in the *EL-307 Handbook,* which is modeled after the EEOC's "Interpretive Guidance" which lists evidentiary examples, the second step of the interactive process is determining the essential functions of a job and states the following evidence should be considered to determine whether a particular function is essential. (Exhibit 38, at pp. 00196- 00197):

• The employer's judgement
• Written job descriptions
• Amount of time spent performing the function
• The work experience of past incumbents in the job
• The work experience of current incumbent in the job
• Actual duties performed by a person holding the job.

**Written Job Description:** The written Communication Programs Specialist job description does not list driving or travel as a requirement or essential function. (Exhibit 8, at pp. 1-2). The Corporate Communications travel budget for the Southern Area allotted funds for each CPS to travel

to their non-domiciled districts *only once* per year. (Dionne Montague Affidavit 2018 attached as Exhibit 7 to this response, at p. 1, #7).

**Amount of time spent performing the function:** Plaintiff's official travel records shows the infrequent amount of time spent traveling or driving to accomplish the essential function of the CPS Position. (Exhibit 39, at pp. 1-6). Further, the sworn testimony of former seasoned CPS' Steven Seewoester and McKinney Boyd concur that driving and traveling to accomplish the essential functions of a CPS was infrequent. (Exhibit 3, at p. 1) and (Exhibit 4, at p. 1).

**The work experience of past incumbents in the job:** Former CPS 'Steven Seewoester and McKinney Boyd, clearly state in their sworn statement that driving and traveling to accomplish the essential function of a CPS' position was infrequent. (Exhibit 3, at p. 1) and (Exhibit 4, at p. 1). Plaintiff also maintains driving and travel was not an essential function of accomplishing her duties as a CPS. (Exhibit 1, at p.1 #3).

**The work experience of current incumbent in the job:** Current CPS' are telecommuting from home, full-time, and have done so for the past 18 months. This is also compelling evidence that the essential functions of their jobs, for each of their districts, can be conducted remotely.

**Actual duties performed by a person holding the job:** While the Plaintiff held the position of CPS she was required to work remotely, on a permanent daily basis for one of her assigned districts, Gulf Atlantic, which encompassed South Georgia, North Florida and the Texas Pan Handle, while being domiciled in Houston. (Exhibit 1, at p. 5 #15). All the essential functions were accomplished without driving daily or frequent travel. *Id*. In addition, Ms. Gibbs concurred in her deposition that the essential functions could have been accomplished for Houston in the same manner as Plaintiff did for her non-domiciled district, (Gulf Atlantic) which was conducted remotely and without driving daily for face-to-face meetings. (Polly Gibbs Deposition attached as Exhibit 17 to this response, at p. 72, #13-#19 ).

Plaintiff maintains the Reasonable Accommodation Committee only considered the testimony and evidence of Plaintiff's manager (Ms. Gibbs) and did not consider any of the other sources of information, as instructed in the *USPS Reasonable Accommodation, An Interactive Process* handbook EL-307, when determining whether traveling and driving were essential functions of the CPS position. Further, Ms. Williams acknowledges in her recent deposition that it is her responsibility to enforce compliance with disability law and policy. (Exhibit 20, at p. 13, #18-23). And further Ms. Williams clearly understood the policy when she stated, "even in our policy it indicates that you can't always rely on the official position description in determining the essential functions. Sometimes you have to get feedback from the business unit you know those who could speak to it from a practical standpoint." (Exhibit 20, p. 27, #7-#12). However, Ms. Williams failed to follow her own assertion, and the rules governing her position. *Id.*

Plaintiff asserts the purpose and Essential Function of a Communication Programs Specialist is to Communicate, not to drive or travel. (Exhibit 1, at p. 5, #14).

Plaintiff also maintains, driving to face-to-face meetings and communicating in-person is not in itself an essential function; but rather, one method of accomplishing the essential function of communicating. (Exhibit 1, at p.1 #14). The Agency contends that driving/traveling and communicating in person are essential function of the CPS position. However, the 5th Circuit has ruled:

"Courts owe deference to an employer's position description: "consideration shall be given to the employer's judgment as to what functions of a job are essential, and **if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job**." 42 U.S .C. § 12111(8). But this deference is not absolute: The inquiry into whether a particular function is essential initially focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential. For example, an employer may state that typing is an essential function of a position. If, in fact, the employer has never required any employee in that particular position to type, this will be evidence that typing is not actually an essential function of the position. Interpretive Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. pt. 1630, app. § 1630.2(n) (emphasis added). Fact-finders must determine whether a function is "essential" on a case-by-case basis. Id." *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 698 (5th Cir. 2014).

Ms. Gibbs and Ms. Williams acknowledged, in their recent depositions, that when driving is an essential function of a position (ie a rural carrier or truck driver) it is listed in the job description and duties. (Lisa Williams Deposition attached as Exhibit 20 to this response, at pp. 31-34) and (Polly Gibbs Deposition attached as Exhibit 17 to this response, at pp. 36-40) and (Rural Carrier Job Description attached as Exhibit 12 to this response, at pp. 1-4) and (Government Relations Job description attached as Exhibit 11 to this response, at pp. 1-3). **Notably, the Position Description makes no mention of "driving", "traveling" or "in-person contact."** *Id*, (Lisa Williams the Manager of Disability Programs Deposition is attached as Exhibit 20 to this response, at pp. 24-27).

The Court for the Eastern District of Pennsylvania ruled:

"Importantly, courts have recognized that a "requirement" of a given position may be distinguished from the "essential function(s)" of that position for purposes of assessing the second element of a plaintiff's prima facie case. "[T]**he essential function requirement focuses on the desired result rather than the means of accomplishing it**." Skerski, 257 F.3d at 280 (citing 136 Cong. Rec. 11,451 (1990)).[6] See also *Acevedo v. City of Philadelphia,* 680 F. Supp. 2d 716, 733 (E.D. Pa. 2010*)* ("While an employer is free to craft requirements for the positions that it creates, it is not free to avoid the strictures of the ADA . . . by simply characterizing all `requirements' as `essential functions.' A distinction must be made between the requirements of a given position and the essential functions of that position.") (citations omitted)" *Slayton v. Sneaker Villa, Inc*., CIVIL ACTION No. 15-0074, 13 (E.D. Pa. Mar. 20, 2017)

Plaintiff maintains that the method used to successfully accomplish the essential functions in her non-domiciled district (Gulf Atlantic) were all accomplished remotely from Houston through electronic means, and without driving to meetings; thus, eliminating the notion that driving, traveling or in-person meeting are an essential function of a CPS' position. (Exhibit 1, at p.4, #11).

Further, the sworn testimony of former seasoned CPS' Steven Seewoester and McKinney Boyd, who both worked under the same manager, Ms. Gibbs, during the relevant time period, concur that driving and traveling to accomplish the essential function was not essential or a necessity; they did not drive or travel on a regular basis and certainly not remotely close to the 50% that Ms. Gibbs is claiming is the standard. (Affidavit of Stephan Seewoester attached as Exhibit 3 to this response, at p.1) and (Affidavit of Mckinney Boyd attached as Exhibit 4 to this response, at p.1).

The 3rd Circuit in *Skerski v. Time Warner Cable Co.*, 257 F.3d 273 (3d Cir. 2001) gave the following guidance while quoting text from the Congressional Record regarding the ADA:

"The distinction was made by Representative Fish when he introduced amendments to the bill that became the ADA relating to the definition of a "qualified individual" and the reasonable accommodation requirement and which were incorporated into the ADA. In his comments, he stated:

**[***T***]***he essential function requirement focuses on the desired result rather than the means of accomplishing it.*   **For example, in one case under the Rehabilitation Act, the employer required each employee to be able to perform the job with both arms.** ***Prewitt v. U.S. Postal Service*, 662 F.2d 292 (5th Cir.1981). The plaintiff was unable to do this because his disability resulted in limited mobility in his left arm. The court found that the essential function of the job was the ability to lift and carry mail which the employee had proven that he could do, not the ability to use both arms.** Moreover, the court found that the employer was required to adapt the work environment to determine whether the employee with the disability could perform the essential requirements of the job with reasonable adaptations.

Likewise, in a job requiring the use of a computer, the essential function is the ability to access, input, and retrieve information from the computer.   It is not essential that the person be able to use the keyboard or visually read the computer screen, if the provision of adaptive equipment or software would enable the person with the disability-for example, impaired vision or limited hand control-to control the computer and access the information.    The relevant question would be whether the acquisition of the equipment would be a reasonable accommodation, given the factors to be considered in making that determination. 136 Cong. Rec. 11,451 (1990)." *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, at 280-281 (3d Cir. 2001).

Defendant stated Plaintiff's inability to drive prohibited her from being able to perform all the essential functions of a CPS' position and that driving is an essential function.   (Exhibit 18, at pp. 00129, #9).  On page 2 of Defendant's Motion for Summary Judgment (MSJ) the Agency states:

 "*The RAC considered evidence that a CPS acts as a spokesperson for the USPS, gathering, writing, editing, and disseminating a wide variety of information in response to media inquiries, and evidence from Gibbs that plaintiffs responsibilities as a CPS required her to conduct activities outside of the office, including travel within and outside the domicile districts approximately 50% of the time...*" then the MSJ states "*Accordingly, the RAC  determined that travel is an essential function of the plaintiffs position as a CPS.*"

Plaintiff asserts that the RAC did not conduct the Reasonable Accommodation Process in accordance with the interactive process guidelines, and the law governing this process, when the RAC determined driving was an essential function of the Communication Programs Specialist position. (Handbook EL-307 attached as Exhibit 38 to this response, at pp. 00187, 00191, 00196-00198).  The RAC only considered and relied solely upon the **estimated amount** of travel provided in an "email" from Ms.

Gibbs which stated **"My estimation is that a typical CPS devotes at least 50% of their time to outside activities,…"** (Polly Gibbs email to Lisa Williams attached as Exhibit 16 to this response, at p. 140). The RAC ignored the official "documented" travel records showing Plaintiff's travel was minimal[2] (Official travel Expense report attached as Exhibit 39 to this response, at pp. 1-6). Further, the RAC accepted Ms. Gibbs' statement that the estimated 50% travel occurred, but was "undocumented" travel, which is now stated in Defendant's MSJ. Ms. Gibbs also states in her declaration that she is domiciled in Dallas and Plaintiff is domiciled in Houston; therefore, was unable to know where Plaintiff was working from, but then claims in an email she is able to ascertain plaintiff typically spent 50% of her time conducting outside, on-site, and in-person activities; this is in itself a concerning contradiction. (Exhibit 30, at p. 2, #10) and (Exhibit 16, at p.1). Further, by Ms. Gibbs' own admission, during her recent deposition, when asked, "Do you know how Ms. Montague was attending meetings during 2014 and 2015?" and Ms. Gibbs's answered "No". (Exhibit 17, p. 57, #1 through #4).

The Agency also concluded that no reasonable accommodation existed that would enable the Plaintiff to perform the essential tasks of her position. (Exhibit 18, at p. 00129, #11)**.** Plaintiff asserts, this is not a true statement, as Plaintiff was previously provided an accommodation, and was able to perform all the essential functions of her position. (Exhibit 19 at p. 00135 Q10, 11, 12)**.** This fact was also affirmed in Lisa William's sworn EEO affidavit which states **"Ms. Montague is able to perform certain routine duties including writing, editing and designing articles, speeches, press releases,**

---

[2] In *Lavern B. v. Department of Housing and Urban Development*, EEOC Appeal No. 0720130029 (February 12, 2015), the Commission set a precedent concerning essential functions of a job position and telecommuting accommodation related to performing an essential job function. Although administrative decisions are not precedence in federal court they can be used by the Court as persuasive authority.  The issue presented in *Lavern B*, was whether the Complainant proved that the Agency failed to provide him with a reasonable accommodation for his disability.  **The AJ also found that, contrary to the agency's assertion and although the agency maintains that in person interactions, face-to-face meetings are essential functions of complainant's job, they are better characterized as skills or abilities that are useful in performing the essential function of the complainant's position**. *Id* at p. 10. **The AJ further reasoned that, while working collaboratively with colleagues on projects, trainings and mentoring other employees, and attending meeting may be essential functions of the job, doing so in-person is not an essential function. The AJ also noted that meetings can be attended by telephone, video conferencing, and desktop sharing.** *Id.*

*news reports, etc. She is also able to maintain contact with the district for which she is assigned, golf Atlantic and Houston. She can arrange news interviews, social media and print broadcast for postal officials." Id.* This sworn statement lists all the essential functions of the CPS' position. Further, Ms. Gibbs also acknowledged, in her recent deposition, that in-fact Montague could have conducted all the essential functions of her position for Houston in the same manner she did for her non-domiciled district, Gulf Atlantic, which has always been accomplished remotely, without driving, and almost non-existent travel. (Exhibit 17, at p. 72, #13to #19)

The Agency also claims in their MSJ that the plaintiff was offered a reasonable accommodation but rejected the offer. (Exhibit 1, at p. 3, #8 and #9). Plaintiff asserts no offer of an accommodation was ever made. (Exhibit 18, at pp. 130-131 Q. 19, 20, 21). The agency has changed their story several times, over the years, as to whether or not a reasonable accommodation was offered to Plaintiff. First the Agency claimed they considered the requested reasonable accommodation, but it was denied. *Id.* The Agency then stated no accommodation was offered because no accommodation existed. *Id.* The Agency then stated the RAC made suggestion during the interactive meeting as to how the Plaintiff could get to work; take a cab, ride with her husband or walk but those were just suggestions. As time went on, the Agency conveniently attempts to claim those suggestions were an offer of a reasonable accommodation. (Exhibit 20, at p. 54, #3 through #8).

Plaintiff maintains that taking a taxi cab to work or having her husband drive her to work was not an offer of a Reasonable Accommodation. (Exhibit 1, at p.3, #8). Governing law defines a Reasonable Accommodation as assistance or changes to a position or workplace that will enable an employee to do his or her job despite having a disability.

Furthermore, the Plaintiff asserts the RAC continued to be negligent in their actions, having no intention of seeking a reasonable accommodation to offer the Plaintiff which was further demonstrated when they failed to continue the reasonable accommodation process by not searching for another position or reassignment opportunity for the Plaintiff after the requested Reasonable Accommodation

was denied; the Agency acknowledges this in the recent deposition of Polly Gibbs and Lisa Williams. (Exhibit 17, p. 117, #12 through #16) and (Exhibit 20, p. 53, #9 through #25).

The 5th Circuit further ruled in *LHC Group, Inc.*, "**But because the record contains evidence that traveling was not as prominent a part of a Team Leader's duties as the position description suggests**, **taking all reasonable inferences in favor of the EEOC, there is a genuine dispute of material fact as to whether driving was an essential function of that position**." *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 698 (5th Cir. 2014).

The Plaintiff has clearly shown that there is as genuine dispute of material fact as to whether driving, traveling or in-person meetings are essential functions of the CPS position at issue in the present matter before this Court.

### D.  The Accommodation Plaintiff Requested Did Not Create an Undue Hardship for USPS

If the plaintiff satisfies his or her burden, the defendant then has the burden to demonstrate that the proposed accommodation creates an "undue hardship" for it. 42 U.S.C. § 12112(b)(5)(A). The ADA defines "undue hardship" as "an action requiring significant difficulty or expense, when considered in light of [a series of factors]."  42 U.S.C. § 12111(10)(A). Among the factors to be considered are "the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility."  42 U.S.C. § 12111(10)(B).

Defendant asserts in its MSJ that Plaintiff's requested Reasonable Accommodation of telecommuting would have caused an undue hardship on the Agency. (Exhibit 19, at p. 00136, Q23). However, Plaintiff maintains that the evidence shows that Plaintiffs requested reasonable accommodation of working from home, telecommuting as needed, would not create an undue hardship. (Exhibit 5, at p.1). Plaintiff previously, successfully, demonstrated this while telecommuting, as needed, for 5-6 months prior to the cyber intrusion; Plaintiff received a monetary award for her work and a high performance review during this time. *Id.* In addition, all CPS' are currently telecommuting

full-time and have been doing so for the past 18 months; which is evidence that it would not create an undue hardship. (Exhibit 1, at p. 1) Further, Plaintiff asserts the Agency did not deem telecommuting a hardship when they accommodated Plaintiff before the cyber intrusion, it isn't a hardship now, as all current CPS' are currently telecommuting. *Id.*

Plaintiff has also never been required to travel for a natural disaster, in fact the time a natural disaster occurred in one of her assigned districts, Plaintiff was asked by the then Oklahoma District Manager, Julie Goslin, to please stay and work from Houston and stated "***as you can better serve us from there where you have phone and computer access.***"  (Exhibit 1, p. 4, par 12).

### E. Plaintiff Was Constructively Discharged When She Retired Because USPS Refused to Reasonably Accommodate Plaintiff

Plaintiff always enjoyed her work, as a Communication Programs Specialist, and took great pleasure in the contribution she brought to the table. (Exhibit 1, p. 6, par 19). Plaintiff's desire was, and always has been, to continue working. *Id.* However, without an accommodation, Plaintiff would have been compelled to stop taking her medicine and endure intolerable pain. *Id.* On or about July 2017, Plaintiff was constructively discharged and forced to file for disability retirement, because the Agency refused to provide a reasonable accommodation. *Id.*

The facts in this case echo those of cases where courts have found a constructive discharge resulted from a failure to provide reasonable accommodation.  *See, e.g., Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1109 (6th Cir. 2008) ("When Talley was told … that she would not be allowed to use a stool, she may reasonably have believed that she would either have to work her entire shift without a stool – conditions she alleges were intolerable due to severe pain – or resign," and "a reasonable jury could infer that the defendants knew that [the plaintiff's] working conditions would become intolerable to a reasonable person suffering from her particular disability."); *Smith v. Henderson*, 376 F.3d 529, at 537-38 (6th Cir. 2004) (where employer's denial of employee's request for reasonable accommodation "forced her to work well in excess of her medical restrictions," and

employer knew her working conditions would become intolerable to "reasonable person suffering from her particular disability," a reasonable jury could find employee's resignation because of employer's refusal to accommodate employee constituted constructive discharge); *Pagonakis v. Express LLC*, 315 F. App'x. 425, 430 n.4 (3d Cir. 2009) ("[t]o the extent Pagonakis asserts that Express' alleged failure to accommodate … resulted in her constructive discharge, she may present that theory to a jury"); *Schwarz v. Northwest Community Coll.*, 881 F. Supp. 1323, 1339 (N.D. Iowa 1995) (plaintiff with night blindness alleged constructive discharge due to change from day to night shift; court denied summary judgment because reasonable person in plaintiff's position could have found it intolerable to work the evening shift where the shift change "placed particular burdens on [plaintiff] because of a physical problem"); *Hurley-Bardige v. Brown*, 900 F. Supp. 567, 573 n.7 (D. Mass. 1995) ("The Court can certainly imagine instances where the failure to make reasonable accommodation, by itself, *could* create a working environment so hostile that a reasonable employee would resign his or her position.") (posing example of employer refusing to transfer employee with respiratory condition to a smoke-free work station).

Accordingly, a jury could decide on this record that a reasonable person in Plaintiff's position, with her medical condition, would have felt compelled to retire due to the Agency's rigid refusal to modify her schedule, despite medical information indicating that Plaintiff risked serious medical consequences by maintaining her work schedule.

## VIII.    CONCLUSION

Plaintiff's allegations set forth a claim for disability discrimination and as a result, Defendant is not entitled to a dismissal of Plaintiff's claim before this Honorable Court.

WHEREFORE, PREMISES CONSIDERED, and for all of these reasons, Plaintiff prays that Defendant's Motion for Summary Judgment be denied, and for such other and further relief to which she may be justly entitled.

Respectfully submitted,


_____/S/ *Ashok Bail*_____
ASHOK BAIL
ATTORNEY-IN-CHARGE
STATE BAR # 24043541

3120 Southwest Freeway, Suite 450
Houston, TX 77098
(832) 216-6693
(832) 263-0616 (Fax)
ashok@baillawfirm.com




**CERTIFICATE OF SERVICE**

On December 15, 2021, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


By: /s/ Ashok Bail_____
     Ashok Bail

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DIONNE A. MONTAGUE, | § | |
| | § | |
| *Plaintiff*, | § | |
| v. | § | C.A. NO. 4:20-cv-4329 |
| | § | |
| LOUIS DEJOY, POSTMASTER | § | JURY TRIAL DEMANDED |
| GENERAL, UNITED STATES  POSTAL | § | |
| SERVICE (SOUTHERN AREA, | § | |
| | § | |
| *Defendant*. | § | |

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ON THIS DAY the Court considered Defendant's Motion for Summary Judgment.  The

Motion is DENIED.

SIGNED on the _____ day of _____2021.

_____
HONORABLE LYNN HUGHES
UNITED STATES DISTRICT JUDGE

26